UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KEVIN  MARDIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-02131-RLY-MPB |
| | ) | |
| TOWN OF BARGERSVILLE, | ) | |
| OFFICER JEREMY  ROLL, in his | ) | |
| individual capacity; | ) | |
| OFFICER NICK  SNOW, in his individual | ) | |
| capacity, and | ) | |
| OFFICER ZACH  ELLIOT, in his | ) | |
| individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In the early evening hours of August 25, 2013, Plaintiff, Kevin Mardis, was

arrested by Officer Zach Elliot and Officer Nick Snow for battery on a police officer.

After the prosecutor declined to file formal charges, Plaintiff brought the present action

under 42 U.S.C. § 1983 ("Section 1983") against Officer Elliot, Officer Snow, and

Officer Jeremy Roll, who was also at the scene, alleging various violations of his Fourth

Amendment rights.  Plaintiff also brings state law claims for trespass, battery, and false

imprisonment against Officer Elliot, Officer Snow, Officer Roll, and the Town of

Bargersville.  Defendants now move for summary judgment.  For the reasons set forth

below, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED**

**in part**.

1

## I.      Factual Background

As this is a motion for summary judgment brought by the Defendants, the court must take the facts and all reasonable inferences that arise therefrom in the light most favorable to the Plaintiff.

On August 25, 2013, at approximately 1:00 p.m., Plaintiff, his then girlfriend (now wife), Amanda Oakes Mardis, and Amanda's young son, L.L., went to a cookout at a friend's home for about four or five hours.  (Filing No. 32-1, Deposition of Kevin Mardis ("Plaintiff Dep.") at 9; Filing No. 32-2, Deposition of Amanda Mardis ("Mardis Dep.") at 7-8).  While there, Plaintiff had approximately six to eight beers.  (Plaintiff Dep. at 7-9).

On the way home from the cookout, L.L. told Amanda he wanted to go to his grandfather's (David Barrickman) house.  (*Id.* at 8; Filing No. 32-3, Deposition of L.L. ("L.L. Dep.") at 6).  Amanda said no, Plaintiff said yes, and an argument ensued. (Mardis Dep. at 8-9; L.L. Dep. at 6-7).  Unbeknownst to Amanda and Plaintiff, L.L. called his great-grandfather, John Barrickman, "[b]ecause they [Amanda and Plaintiff] were arguing and fighting and [he] wasn't used to that, so [he] wanted to leave."  (*Id.* at 7).  John apparently heard the commotion over the phone and called 911.  (*Id.*; Mardis Dep. at 12; Plaintiff Dep. at 11).  He reported that Plaintiff was trying to put Amanda in the dryer and that Plaintiff was drunk and fighting.  (Filing No. 24-1, Affidavit of Judd Green, Ex. A – radio traffic).

Twenty minutes after the three arrived home, Amanda received a call from 911 asking her "if everything was okay, that they had had a call of a domestic dispute." (Mardis Dep. at 13-14).  During the call, Officer Elliot entered the driveway in his police

vehicle.  (*Id.* at 14).  Amanda knew Officer Elliot personally, and told him "everything was fine, there was no issue."  (*Id.*).  Around this time, Officer Snow and Officer Roll arrived.  (Filing No. 32-8, Deposition of Zachary Elliot ("Elliot Dep.") at 14).  The Officers described Amanda as very upset.  (*Id.* at 14; Filing No. 32-10, Deposition of Nicholas Snow ("Snow Dep.") at 16; Filing No. 32-9, Deposition of Jeremy Roll ("Roll Dep.") at 24).

Officer Elliot asked where Plaintiff was; Amanda indicated that he was inside the house on the couch and to "come in."  (Snow Dep. at 16; *see also* Elliot Dep. at 14 ("As [Amanda] walks in, I follow her, and she points to the male on the couch.").  According to the Complaint, all three Officers followed Amanda inside the house "without invitation or cause to do so."  (Filing No. 1, Complaint ¶ 18[1]).  Officer Elliot testified that Plaintiff was "argumentative, he's loud, he's yelling profanities at me, he's asking me why I'm in his house."  (Elliot Dep. at 16; *see also* Snow Dep. at 17 (testifying Plaintiff was uncooperative and had his "fists balled up")).  Plaintiff did not admit to being

---

[1] Both Plaintiff and Amanda testified that when the Officers arrived, they were not allowed into the house.  (Plaintiff Dep. at 15-16) (testifying that he met Officer Elliot and Officer Snow at the front door and spoke to them with the door cracked open); (Mardis Dep. at 16) (testifying she thought Officer Elliot "just went in the house"; Filing No. 32-5, Affidavit of Kevin Mardis ("Plaintiff Aff.") ¶ 2; Filing No. 32-6, Affidavit of Amanda Mardis ("Mardis Aff.") ¶ 9). However, Paragraph 18 of Plaintiff's Complaint contradicts their testimony.  It alleges, "Defendant Officers followed Ms. Oakes into the residence without invitation or cause to do so, and remained inside the residence upon Ms. Oakes' exit."  (Complaint ¶ 18).  Plaintiff's allegation is a judicial admission of fact; therefore, he is bound by it.  *Help At Home, Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001) ("Judicial admissions are formal concessions in the pleadings, or stipulations by the party of its counsel, that are binding upon the party making them.").

argumentative, but he testified to saying, "if there's nothing you guys are arresting me

for, I didn't do anything wrong, you need to get off my property and there's no reason to

talk to me." (Plaintiff Dep. at 16). He "was, you know, getting frustrated." (*Id*.).

Officer Roll asked Amanda to step outside to talk. (Roll Dep. at 27; Snow Dep. at

17). Amanda began arguing with Officer Roll in the front yard because "[she] was fine,

there was no reason for them to be there." (Mardis Dep. at 17). John and David

(Amanda's father) arrived in a minivan to pick up L.L. (Filing No. 32-4, Deposition of

David Barrickman at 6-7; Filing No. 32-9, Roll Dep. at 25). Amanda turned her anger

towards John, telling him, "[T]his was ridiculous and why did you call [911]?" (Mardis

Dep. at 18; Roll Dep. at 25). At that point, Officer Snow left the house to assist Officer

Roll. (Snow Dep. at 18). Amanda would not stop yelling and increased her volume of

voice. (Roll Dep. at 32; Snow Dep. at 18; Plaintiff Dep. at 17; Filing No. 32-11,

Affidavit of Probable Cause). Officer Roll then placed Amanda under arrest for

disorderly conduct. (Roll Dep. at 32; Affidavit of Probable Cause).

Meanwhile, Officer Elliot stepped onto the front porch to see what was going on

outside. (Elliot Dep. at 17). He claims Plaintiff stepped onto the porch, directly in front

of him, for about fifteen or twenty seconds. (*Id*. at 17, 24; *see also* Snow Dep. (testifying

Plaintiff stepped onto the porch, "I guess to see whoever was in the vehicle"). Plaintiff

claims he remained inside the house with the door cracked open because "it was going all

bad out there [and] [he] didn't want to get arrested." (Plaintiff Dep. at 17-18; Plaintiff

Aff. ¶ 2). According to Plaintiff, Officer Elliot "kept saying, you know, you need to let

us inside to talk to you and we need to talk." (Plaintiff Dep. at 15). Plaintiff informed

him that "there was nothing to talk about," he "didn't do anything wrong," and he "didn't know what this was even about." (*Id*. at 15, 16).

According to Officer Elliot and Officer Snow, Plaintiff turned around and "quickly [went] into . . . his residence." (Elliot Dep. at 24; Snow Dep. at 19). Officer Elliot "instinctively" followed him into the house because he didn't "know what he was going into the house for, [didn't] know if there [was] weapons, anything else." (*Id*. at 25). As he stepped onto the threshold of the door, Plaintiff tried to shut the door. (Elliot Dep. at 25; Plaintiff Dep. at 18). Plaintiff "had no idea that [Officer Elliot's] foot was in the door." (Plaintiff Dep. at 18; Plaintiff Aff. ¶ 6). Plaintiff "appl[ied] pressure to the door," trapping Officer Elliot's left foot between the threshold of the door and the door frame. (Plaintiff Dep. at 18; Elliot Dep. at 25). At this juncture, Officer Snow returned to the porch to assist Officer Elliot. (Snow Dep. at 19). Once Officer Elliot freed his foot, Plaintiff tried to shut the door again, but "they kicked the door right open." (Plaintiff Dep. at 19). The corner of the door hit Plaintiff's right eyebrow, causing it to bleed. (*Id.*; Elliot Dep. at 39; Snow Dep. at 20). Officer Elliot and Officer Snow placed Plaintiff under arrest for battery on a police officer, handcuffed him, and placed him in a police vehicle. (Elliot Dep. at 39-40; Snow Dep. at 20).

Officer Elliot contacted the local EMS to provide treatment for the cut over Plaintiff's right eye. (Elliot Dep. at 39). When the ambulance arrived, Officer Elliot and Officer Snow took Plaintiff to the vehicle for treatment. (*Id.*; Plaintiff Dep. at 19-20). Plaintiff was uncooperative with EMS personnel. (Plaintiff Dep. at 21-22). He would

not get into the ambulance, but was seated on the back of the ambulance as the EMS personnel attempted to treat the cut and assess any other injuries. (*Id.* at 20-21).

As Plaintiff was being treated, Amanda, who was seated in the back of Officer Roll's vehicle a short distance away from the ambulance, managed to get one hand free of the handcuffs and was pounding on the window of the vehicle. (Roll Dep. at 46-47). Officer Roll opened the back door of his vehicle, placed Amanda back in the handcuffs and double-locked the handcuffs. (*Id.* at 47). At this point Plaintiff got up from his seat on the ambulance and appeared to be charging toward Officer Roll. (*Id.*; Snow Dep. at 22). Officer Snow took Plaintiff to the ground, and with the assistance of Officer Roll, picked him up off the ground and returned him to the ambulance. (Snow Dep. at 22-23). Plaintiff's testimony differs; according to him, as he "went to get down from the ambulance, one of them put his foot in front of my leg and the other one grabbed my cuffs and threw me over the other and I went straight on my face." (Plaintiff Dep. at 21). Plaintiff then asked them to pick him up. (*Id.*).

During this time, Amanda's father, David, took L.L. home with him. (Mardis Dep. at 23; Affidavit of Probable Cause).

Formal charges were never filed against Plaintiff. (Plaintiff Dep. at 27). The disorderly conduct charge against Amanda was later dropped. (Mardis Dep. at 21).

## II.    Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Summary judgment is appropriate

"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of designated evidence which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *Clifton v. Schafer,* 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N. D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *Anderson,* 477 U.S. at 255; *Abdullahi v. City of Madison,* 423 F.3d 763, 773 (7th Cir. 2005) (reversing summary judgment for defendant in excessive force case).

### III.    Federal Law Claims

Plaintiff brings three Fourth Amendment claims against the Officers.  In Count I, Plaintiff alleges the "Defendant Officers unlawfully entered Plaintiff's residence." (Complaint ¶ 48).  In Count II, Plaintiff alleges the "Defendant Officers illegally arrested Plaintiff after battering him."  (*Id.* ¶ 54).  And in Count III, Plaintiff alleges the "Defendant Officers employed, or allowed to be employed, excessive and unreasonable force against Plaintiff."  (*Id.* ¶ 59).  Plaintiff's Fourth Amendment claims are brought under Section 1983.  That statutory section provides a private cause of action against a person who, acting under color of state law, deprives an individual of any "'rights, privileges, or immunities secured by the Constitution and laws'" of the United States. *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (quoting 42 U.S.C. § 1983).  "Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced."  *Bublitz v. Cottey*, 327 F.3d 485, 488 (7th Cir. 2003).

The Fourth Amendment issues presented surround Plaintiff's arrest.  The Officers argue that summary judgment is warranted because: (1) they did not violate Plaintiff's Fourth Amendment rights and, alternatively, (2) they are entitled to qualified immunity.

A determination of qualified immunity must be made early in the litigation, as "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'"  *Saucier v. Katz*, 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need

to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.  When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  In evaluating qualified immunity, the court considers two questions:  "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013) (citing *Pearson*, 555 U.S. at 232).  The court has discretion to determine in which order the questions should be answered; "a negative answer to either one is enough to establish the defense of qualified immunity." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009).

### A.    Count II, False Arrest

#### 1.    Constitutional Violation

To be deemed reasonable under the Fourth Amendment, a warrantless arrest (a type of "seizure") made in public must be supported by probable cause. *Gutierrez v. Kermon*, 722 F.3d 1003, 1007 (7th Cir. 2013).  Thus, the existence of probable cause is an absolute defense to a Section 1983 claim of false arrest. *Id*. (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)).

Probable cause to arrest exists when an officer reasonably believes, in light of the facts and circumstances within the knowledge of the arresting officer at the time of the

arrest, that the suspect had committed or was committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964); *Gutierrez*, 722 F.3d at 1008. The test is an objective one, which evaluates whether probable cause existed "'on the facts as they would have appeared to a reasonable police officer in the position of the arresting police officer—seeing what he saw, hearing what he heard.'" *Kelley v. Milar*, 149 F.3d 641, 646 (7th Cir. 1998) (quoting *Mahoney v. Kesery*, 976 F.2d 1054, 1057 (7th Cir. 1992)). "[P]robable cause does not require a finding that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013). "It is a practical, commonsense standard that requires only the type of fair probability on which reasonable people act." *Gutierrez*, 722 F.3d at 1008. To prevail, the Officers must establish, as a matter of law, that they had probable cause to arrest Plaintiff for "*any* crime, regardless of the officer's belief as to which crime was at issue." *See Abbott*, 705 F.3d at 715. The existence of probable cause depends on the elements of the predicate criminal offense under state law. *Id*.

As noted above, Officer Elliot, with the assistance of Officer Snow, arrested Plaintiff for the crime of battery on a police officer. In this Section 1983 action, the Officers also claim they had probable cause to arrest Plaintiff for resisting law enforcement.

### a.    Battery on a Police Officer

At the time the events in this case transpired, the knowing and intentional touching of a police officer in a rude, insolent, or angry manner was battery on a public servant, a

Class A misdemeanor. [2]  Ind. Code § 35-42-2-1.  Officer Elliot testified that as Plaintiff was shutting the door, he simultaneously tried to enter Plaintiff's home.  Plaintiff had "no idea" Officer Elliot's foot was on the threshold of the door.  (Plaintiff Aff. ¶ 6).  When he was unable to close the door, he "kind of appl[ied] pressure to the door."  (Plaintiff Dep. at 18).  According to Plaintiff, he "wasn't putting enough pressure to do anything."  (*Id.* at 19).  It is not clear from the record whether Plaintiff applied pressure knowing that Officer Elliot's foot was stuck, whether the pressure he applied was with force, or whether he simply tried to shut the door despite the Officers' resistance.

Giving Plaintiff "the benefit of the conflicts in the evidence about what [Officer Elliot and Officer Snow] actually knew at the time," *Williams*, 733 F.3d at 756, a reasonable juror could conclude that the facts as they appeared to Officer Elliot and Officer Snow did not support a reasonable belief that Plaintiff committed the crime of battery, and that the door trapped Officer Elliot's foot by accident.  Therefore, Plaintiff has offered sufficient evidence from which a jury could conclude that Officer Elliot and Officer Snow did not have probable cause to arrest him for the crime of battery.

### b.    Resisting Law Enforcement

The crime of resisting law enforcement consists of the following elements:

A person who knowingly or intentionally:  .  .  .  (3) flees from a law enforcement officer after the officer has, by visible or audible means .  .  . identified himself or herself and ordered the person to stop.

---

[2] Battery on a police officer is now a Level 6 felony.  *See* Indiana Code § 35-42-2-1(c) and (e)(2).

Ind. Code § 35-44.1-3-1.  Plaintiff maintains that Officer Elliot did not have probable

cause to arrest him for resisting law enforcement because he never ordered Plaintiff to

"stop."

Under the plain language of the statute, an officer's order to stop may be either

audible or visual.  *Fowler v. State*, 878 N.E.2d 889, 894 (Ind. Ct. App. 2008) (citing

*Spears v. State*, 412 N.E.2d 81, 83 (Ind. Ct. App. 1980)).  "Evidence of a proper visual

order to stop is based on the circumstances surrounding the incident and whether a

reasonable person would have known that he or she had been ordered to stop."  *Id.* at

894-95.

For example, in *Leonelli v. City of Kendallville*, the plaintiff brought an action

under Section 1983 alleging that police officers had violated his Fourth Amendment

rights by falsely arresting him.  No. 1:07-cv-121, 2008 WL 3874701, at *4 (N.D. Ind.

Aug. 15, 2008).  The police officers had been called to his home on a report of domestic

disturbance and were advised that someone had started a fire on the front lawn.  *Id.* at *2.

When the officers arrived, they observed the plaintiff (Leonelli) standing at the front door

and a large fire on the front lawn.  *Id.* at *3.  A neighbor informed Officer Davis that

there was another domestic dispute occurring in the house.  *Id.*  Officer Davis, wearing a

full police uniform, identified himself as a police officer and instructed the plaintiff to

come and talk to him.  *Id.*  Rather than follow the officer's order, Leonelli shook his

head, turned around and walked inside the house.  *Id.*  The officer instructed him to talk

to him again, but he continued to walk away.  *Id.*  Relying on Indiana law, the district

court found, as a matter of law, that the plaintiff's failure to comply with the officer's

instruction to "come to him and talk to him," "in light of the raging fire on Leonelli's front lawn," provided probable cause to arrest the plaintiff for resisting law enforcement. *Id.* at *7. "Clearly," the district court observed, "these words alone would convey to a reasonable person, especially under the circumstances, the message that turning and walking away was not an appropriate response." *Id.*

The Officers also rely on *Wellman v. State*, 703 N.E.2d 1061 (Ind. Ct. App. 1998). There, a case worker from child services and a police officer went to Wellman's house to investigate a report of child abuse. *Id.* at 1062. Wellman met them at the door, but was generally uncooperative. *Id.* The police officer told him he should cooperate, but Wellman said he would "have to respectfully resist." *Id.* Wellman then indicated he was going back inside his house. *Id.* The officer told him not to do so, but he went inside anyway and locked the door. *Id.* The Indiana Court of Appeals upheld his conviction for resisting law enforcement. *Id.* at 1063. "[I]t is enough that Wellman disobeyed a command to remain by walking away from Officer Hatfield into his own house and thereafter locking the door behind him." *Id.*

Accepting as true for the limited purpose of summary judgment Plaintiff's account of the facts, his case is distinguishable from *Leonelli* and *Wellman* for several reasons. First, there were no circumstances requiring immediate police action. There was no report of a domestic disturbance or child abuse occurring inside the home, and there was no visible evidence of anything remotely as serious as a fire in the front yard. In fact, when the officers arrived, the persons allegedly involved in the domestic disturbance— Amanda and Plaintiff—had separated; Amanda was in the front yard and the Plaintiff

13

was inside the house.  Second, Officer Elliot did not instruct or command the Plaintiff to remain at the door.  Under the circumstances of this case, stating "let's talk" and "we need to talk" is different from "come and talk to me" and "do not go inside."  Third, Plaintiff did not ignore Officer Elliot and walk away.  He told them that nothing had happened and there was nothing to talk about.  Accordingly, based on the version of the evidence most favorable to the Plaintiff, a reasonable jury could find that the Officers did not have probable cause to believe that he was committing or had committed a crime on August 25, 2013.

### 2.   Qualified Immunity

In a false arrest case, whether the right was clearly established is framed as "'whether a reasonable police officer could have mistakenly believed that probable cause existed.'"  *Williams*, 733 F.3d at 758 (quoting *Fleming v. Livingston Cnty.*, 674 F.3d 874, 880 (7th Cir. 2012)).  This is known as "arguable probable cause."  *Id.*  Like the probable cause inquiry, the existence of arguable probable cause depends on the elements of the predicate criminal offenses as defined by statute.  *Abbott*, 705 F.3d at 715.

### a.   Battery

At the time of the alleged offense, the law was clearly established that the crime of battery on a police officer required an intentional touching in a rude, insolent, or angry manner.  Ind. Code § 35-42-2-1.  The issue of intent is a disputed issue of material fact.  Accordingly, unless Officer Elliot and Officer Snow had arguable probable cause to arrest Plaintiff for some other crime, the Officers are not entitled to qualified immunity on this claim.  *Morfin v. City of Chicago*, 349 F.3d 989, 1000 n.13 (7th Cir. 2003)

(reversing summary judgment in a false arrest case where the parties' disputed facts were at the heart of the qualified immunity issue, noting the court "cannot determine as a matter of law, what predicate facts exist to decide whether or not the officers' conduct clearly violated established law"); *Brandon v. Vill. of Maywood*, 157 F. Supp. 2d 917, 928 (N.D. Ill. 2001) (denying summary judgment on qualified immunity to officers in false arrest case where fact questions regarding the circumstances of arrest were in dispute); *Larson v. Cantrell*, 974 F. Supp. 1211, 1218 (N.D. Ind. 1997) ("Although qualified immunity is a question of law that a court should resolve before trial if possible, the court cannot do so where the question turns on facts that are in dispute.").

### b.    Resisting Law Enforcement

At the time of Plaintiff's arrest, the crime of resisting law enforcement consisted of the following elements: a person who (1) knowingly or intentionally (2) flees a law enforcement officer (3) after the officer, by visual or audible means, ordered the suspect to stop. *Fowler*, 878 N.E.2d 894. Plaintiff argues the Officers are not entitled to qualified immunity because there remains a genuine issue of material fact as to whether he fled the Officers.

In *Wellman*, the court concluded that "'flight' in this context should be understood to mean a knowing attempt to escape law enforcement when the defendant is aware that a law enforcement officer has ordered him to stop or remain in place once there." 703 N.E.2d at 1063. Thus, the term flight can be as simple as "disobey[ing] a command to remain by walking away from [the officer] into his own house and thereafter locking the door behind him." *Id.*

Viewing the evidence in the light most favorable to Plaintiff, there was no verbal command, order, or other directive to remain at the door, and there were no extenuating circumstances warranting a reasonable belief that further investigation inside the home was necessary.  Plaintiff therefore had the right to end the consensual conversation by closing the door.  *United States v. Berkowitz*, 927 F.2d 1376, 1387 (7th Cir. 1991) (where police enter a home without consent and before announcing their authority to arrest, "the arrestee has not relinquished his right to close the door on the unwanted visitors"); *see also Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2008) (where police officers investigate a 911 call by speaking to the plaintiff through a partially opened door, he may manifest his intent to end the conversation by closing the door).  Therefore, the Officers are not entitled to qualified immunity for false arrest.

### c.    Conclusion

The court finds genuine issues of material fact exist as to whether the Officers had probable cause to arrest Plaintiff and that the Officers are not entitled to qualified immunity.  Accordingly, Defendants' motion for summary judgment on Count II of Plaintiff's Complaint is **DENIED**.

### B.    Count I, Unlawful Entry

### 1.    Constitutional Violation

In Count I of his Complaint, Plaintiff challenges the Officers' warrantless entry into his home, arguing it constituted an unreasonable search in violation of the Fourth Amendment.  Two Fourth Amendment cases provide context to the issue presented.  First, police officers may make a warrantless arrest in a public place if they have probable

cause.  *United States v. Watson*, 423 U.S. 411, 423-24 (1976).  Second, police officers

may not enter a home to effectuate an arrest without a warrant, even if they have probable

cause, absent consent or exigent circumstances.  *Payton v. New York*, 445 U.S. 589-90

(1980).  Here, the Officers invoke both exceptions to the warrant requirement.

### a.   Consent

When the Officers first arrived on Plaintiff's property, they entered Plaintiff's

home to speak to him.  Plaintiff alleges that the Officers followed Amanda into the house

"without invitation or cause to do so."  (Complaint ¶ 18).  The Officers claim she allowed

them into Plaintiff's home.  (Snow Dep. at 16; Elliot Dep. at 14).  The issue raised is

whether Amanda gave the Officers consent to enter Plaintiff's home.

Where someone with the authority to do so gives police officers consent to enter,

their entry is reasonable and not in violation of the Fourth Amendment.  *Harney v. City of*

*Chicago*, 702 F.3d 858, 925 (7th Cir. 2012).  Consent may be manifested in a non-verbal

manner.  *Id.*  For example, "the act of opening a door and stepping back to allow entry is

sufficient to demonstrate consent."  *Id.*  Furthermore, informing law enforcement to "wait

here," but failing to "verbally object or physically respond in any way that might relay

the message [the homeowner] disapproved of [the officer's] movement," falls short of

showing that under the totality of the circumstances consent was involuntarily given.  *Id.*

(citing *Gerald M. v. Conneely*, 858 F.2d 378, 384-85 (7th Cir. 1998).

Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury

could conclude that Amanda manifested her non-verbal objection to the Officers'

presence inside Plaintiff's home.  Therefore, a reasonable jury could find Amanda did not give consent to the Officers.

### b.    Hot Pursuit

Officer Elliot and Officer Snow entered Plaintiff's house a second time to arrest him.  Plaintiff did not give consent for them to enter; indeed, he admits he told them to get off of his property and attempted to shut the front door.  The issue, then, is whether the Officers' warrantless entry is excused because of an exigent circumstance; *e.g*, that they were in "hot pursuit" of a fleeing suspect.  The Officers rely on *United States v. Santana*, 427 U.S. 38 (1976), to justify their warrantless entry into Plaintiff's house.

In *Santana*, *supra*, the police suspected Santana of distributing heroin and had received a tip that she was holding marked money that was used to make a heroin buy. *Id.* at 40.  Officers drove to her home and observed her standing in the doorway holding a paper bag.  *Id.*  After they identified themselves as police officers and displayed their identification, Santana fled into the vestibule of her house.  *Id.*  The officers followed her into her house, arrested her, and seized heroin and marked bills.  *Id.* at 40-41.  Santana moved to suppress the evidence.

The Supreme Court held that Santana did not have a reasonable expectation of privacy in her doorway.  "She was not merely visible to the public but was exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house."  *Id.* at 42.  Thus, because the police had probable cause to arrest Santana, they could arrest her in her doorway.  *Id.*  The Court next considered "whether her act of retreating into her house could thwart an otherwise proper arrest."  *Id.*  The Court held

18

that it could not because the case involved "a true 'hot pursuit.'"  *Id.*  The Court

reasoned:  "[A] suspect may not defeat an arrest which has been set in motion in a public

place . . . by the expedient of escaping to a private place."  *Id.* at 43.

Another "doorway arrest" case worthy of mention is *Cummings*, *supra*.  There, the

police were called to investigate a domestic dispute.  418 F.3d at 679.  The alleged victim

informed the officers that her boyfriend, Carl Bromback, was inside the home of Clifford

Cummings.  *Id.*  Officer Sherman opened the screen door and knocked on the entry door.

*Id.*  Cummings came to a window inside the home and asked why they were there.  *Id.*

Officer Sherman asked him to come to the front door.  *Id.*  Cummings complied, but

opened the door only partially.  *Id.*  During their conversation, Officer Sherman placed

his foot inside the doorway; Officer Vaughn stood behind him.  *Id.*  Cummings informed

him that Bromback was not inside the house and refused Officer Sherman's request to

come inside.  *Id.*  After Officer Sherman asked Cummings about the smell of marijuana,

Cummings tried to shut the door but Officer Sherman's foot was in the way.  *Id.*  The

Officers burst inside the home and arrested him.  *Id.* at 680.

In Cumming's Section 1983 action for illegal entry and false arrest, the Officers

claimed that they had probable cause to believe Cummings committed the crime of

assault, and their entry into his home was justified under the hot pursuit exception to the

warrant requirement.  *Id.* at 685-86.  In rejecting the Officers' argument, the Sixth Circuit

reasoned that Cummings, unlike the plaintiff in *Santana*, "never fully exposed himself to

the public view, given that he only opened the door very slightly, and only at the request

of the police."  *Id.* at 686.  In addition, "unlike the situation in *Santana*, Sherman and

19

Vaughn did not attempt to arrest Cummings until after he tried to shut the door, at which point he clearly indicated that he did not wish to be exposed to the public." *Id.* The court also questioned Officer Sherman's assault claim because there was no record evidence showing that Cummings knew Officer Sherman's foot was in the doorway when he attempted to shut the door. *Id.*

Plaintiff's version of events is remarkably similar to those in *Cummings*. Like Cummings, Plaintiff manifested his intent to maintain the privacy in his home by speaking to Officer Elliot through a partially open door. *See also Berkowitz*, 927 F.2d 1388 ("The person who answers a knock and stays within the house is not voluntarily exposing himself to public view. . . ." (citing *Santana*, 427 U.S. at 42). Plaintiff therefore remained in a private place, and thus did not flee from a public place to a private place to evade law enforcement. For that reason alone, the hot pursuit exception does not support the Officers' entry into Plaintiff's home.

Furthermore, Officer Elliot testified he went inside the house "[t]o continue the investigation, and the, you know, because of him slamming my foot in the door, the battery that had occurred . . . ." (Elliot Dep. at 38). His testimony raises two other issues underlying the reasonableness of the warrantless entry. The first issue is *when* the Officers reasonably believed they had probable cause. One could argue, based on Officer Elliot's testimony, that the Officers did not reasonably believe they had probable cause to arrest Plaintiff for resisting or battery until *after* Officer Elliot's foot was in the door and the struggle with the door began. Yet, by that time, Officer Elliot was, for purposes of the Fourth Amendment, inside Plaintiff's home. *Berkowitz*, 927 F.2d at 1386 ("*Payton*

20

holds the Fourth Amendment draws a clear line at the entrance of a person's house:

'Absent exigent circumstances, that threshold may not reasonably be crossed without a

warrant.'") (quoting *Payton*, 445 U.S. at 590).  Second, an ordinary investigation of

possible criminal activity, like the one presented in this case, "does not qualify" as an

exigency.  *Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014) (citing *United States v.*

*Venters*, 539 F.3d 801, 807 (7th Cir. 2008) (situation must present a "compelling need for

official action [with no] time to secure a warrant").  This is particularly true where, as

here, there was no visible evidence of physical abuse on Amanda, (*see* Snow Dep. at 26),

and no evidence anyone else was in the house.  Therefore, Plaintiff's refusal to continue

answering Officer Elliot's questions was not an exigency justifying the Officers' entry

into Plaintiff's home.

### 2.    Qualified Immunity

#### a.    Consent

The Officers argue that the question of whether Plaintiff could "revoke" the

consent given by Amanda has not been clearly established.  They do not develop their

argument; instead, they merely provide a citation to *Georgia v. Randolph*, 547 U.S. 103

(2006).

In *Georgia*, the wife of the defendant informed a police officer that her husband

was using illegal drugs.  *Id.*  The officer asked the defendant for permission to search the

house, but he "unequivocally refused."  *Id.*  The officer then asked the wife for consent to

search, which she gave.  *Id.*  The defendant was ultimately indicted for possession of

cocaine.  *Id.*  Following the trial court's denial of the defendant's motion to suppress

evidence, his case was appealed to both the Georgia Court of Appeals and the Georgia

Supreme Court.  The Supreme Court granted certiorari, and held "that a warrantless

search of a shared dwelling for evidence over the express refusal of consent by a

physically present resident cannot be justified as reasonable as to him on the basis of

consent given to the police by another resident."  *Id.* at 120.

The court presumes the Officers cited *Georgia* for the majority's response to the

dissent's concern regarding the impact the Court's ruling may have on domestic abuse

victims.  In rejecting the dissent's argument, the majority explained:

> But this case has no bearing on the capacity of the police to protect domestic
> abuse victims. . . .  No question has been raised, or reasonably could be, about
> the authority of the police to enter a dwelling to protect a resident from
> domestic violence; so long as they would have good reason to believe such a
> threat exists, it would be silly to suggest that the police would commit a tort
> by entering, say, to give a complaining tenant the opportunity to collect
> belongings and get out safely, or to determine whether violence (or threat of
> violence) has just occurred or is about to (or soon will) occur, however much
> a spouse or other co-tenant objected.

*Id.* at 118.

The Officers' reliance on this case presupposes that Amanda did give them

consent to enter when they first arrived on her property.  When they exited the home and

tried to come back in, Plaintiff unequivocally refused their entry.  From that perspective,

*Georgia* actually undercuts the Officers' defense and provides support for Plaintiff's

illegal entry claim.  To the extent the Officers rely on the dicta from *Georgia* cited above,

the present facts would not support Officer Elliot's spontaneous entry into Plaintiff's

home to assist Amanda, because all agree she had been arrested by that time.

At any rate, the court must take the facts as Plaintiff views them. From that perspective, the court cannot definitively decide whether the Officers are entitled to qualified immunity because the issue of whether the Officers were given consent to enter when they first arrived on Plaintiff's property is in dispute. Accordingly, this underlying issue of fact precludes the court from finding that the Officers are entitled to qualified immunity. *Morfin*, 349 F.3d at 1000 n.13.

### b.    Hot Pursuit

Relying on *Stanton v. Sims*, 134 S.Ct. 3 (2013), the Officers argue that it was not clearly established that the warrantless entry into a home, in hot pursuit of a suspect who an officer has probable cause to arrest for a misdemeanor, violated the Fourth Amendment. *Id.* at 5. Here, the charges at issue were misdemeanors; however, there are two genuine issues of material fact that preclude the court from granting the Officers qualified immunity based on the hot pursuit exception to the warrant requirement. *Morfin*, 349 F.3d at 1000 n.13. First, as noted previously, Plaintiff claims he was inside the home during the Officers' investigation of the 911 call, but the Officers claim he stepped outside onto the porch for twenty or thirty seconds, and then retreated back inside. (Elliot Dep. at 17 ("[Plaintiff] had stepped out onto the front porch, just directly in front of me."); Snow Dep. at 19 ("At that time, both Officer Elliot and [Plaintiff] walked out onto the front porch."); Plaintiff Dep. at 17-18 (testifying he did not go outside after Amanda was detained in Officer Roll's car "[b]ecause I didn't want to get arrested"). This affects the hot pursuit theory advanced by the Officers because if Plaintiff was on the porch, he was technically outside his home when the events leading

to his arrest inside the home occurred.  Second, there is an issue of fact as to whether the

Officers had probable cause to arrest Plaintiff.

### c.   Conclusion

The court finds genuine issues of material fact exist as to whether the Officers had

consent to enter Plaintiff's home and on whether the Officers could legally enter the

home under the theory of hot pursuit.  The court further finds the Officers are not entitled

to qualified immunity at this juncture.  Therefore, Defendants' motion for summary

judgment on Count I of Plaintiff's Complaint is **DENIED**.

### C.   Count III, Excessive Force

In Count III, Plaintiff alleges Officer Elliott and Officer Snow used excessive

force when they forced open the door.  He also alleges Officer Snow used excessive force

when he took Plaintiff to the ground for allegedly charging at Officer Roll from the

ambulance.

"[T]he Fourth Amendment prohibits law enforcement from using excessive force

during the execution of a seizure."  *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th

Cir. 2000) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  A seizure occurs

"where there is a governmental termination of freedom of movement *through means

intentionally applied*."  *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis in

original).  In other words, "the Fourth Amendment addresses 'misuse of power,' not the

accidental effects of otherwise lawful government conduct."  *Id.*

According to Plaintiff, Officer Elliot's foot prevented him from closing the door.

(Plaintiff Dep. at 18).  He continued, "And then his foot went out of the door and I went

24

to shut the door then, and that was whenever they [Officer Elliot and Officer Snow] kicked the door back open." (*Id.* at 19). The door hit Plaintiff in the face, "and they both kind of looked at each other. You could tell they were like . . . . Then they both just came in the house and said quit resisting, quit resisting." (*Id.*). According to Officer Elliot, he told Plaintiff, "My foot's in the door. Kevin, open the door." (*Id.* at 34). "He's not opening it, so I used force to get the door open." (*Id.* at 34-35).

Whether the door was forced open to gain entry into Plaintiff's home, as he contends, or whether the door was forced open to free Officer Elliot's foot, there is no evidence that the forcing of the door was "the means intentionally applied" to effect a seizure. Instead, it was an accident. *See Campbell v. White*, 916 F.2d 421, 423 (7th Cir. 1990) (finding officer's collision with the decedent "was not 'the means intentionally applied' to effect the stop, but rather was an unfortunate and regrettable accident"). As such, the court must find the Officers did not use excessive force when they forced in the door.

As for Plaintiff's second claim of excessive force based solely on the actions of Officer Snow, Plaintiff failed to respond to the Officers' argument that Officer Snow's action in taking him down for allegedly charging at Officer Roll was reasonable under the circumstances. By failing to respond to this challenge, Plaintiff has waived his claim against Officer Snow. *See Wojtas v. Capital Guardian Trust Co.*, 447 F.3d 924, 926 (7th Cir. 2007) (failure to offer opposition to argument constitutes waiver). For all of these reasons, summary judgment is **GRANTED** in favor of Defendants on Count III of Plaintiff's Complaint.

**D.     Municipal Liability**

A municipality may be liable under Section 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)).  Plaintiff's claim is based on the testimony of Officer Snow.  He testified that in cases of battery or abuse, police officers do not interview juveniles; instead, it was his understanding that the officers are to call detectives to the scene to conduct the interview.  (Snow Dep. at 28-29).  This policy, Plaintiff claims, created a situation in which the purported complaining witness, L.L., could not talk to the police and inform them that nothing had happened between his mother, Amanda, and Plaintiff.  Had they spoken to L.L., Plaintiff claims, they would have believed him and left.

When responding to a 911 call concerning domestic battery, it is reasonable for the police to speak with the adults involved first.  There is no evidence, beyond Plaintiff's speculation, that the Town's policy, which precluded the officers from interviewing L.L., was the "moving force" behind the alleged deprivation of Plaintiff's constitutional rights. *Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002) (describing causation as the "moving force" behind the constitutional deprivation).  Instead, the moving force behind Plaintiff's arrest was the culmination of a chain of events between Plaintiff and the

26

Officers.   Defendants' motion for summary judgment on Plaintiff's municipal liability claim is **GRANTED**.

## IV.   State Law Claims

Plaintiff brings state law claims for trespass (Count IV), battery (Count V), and false imprisonment (Count VI) against the Officers and the Town under the doctrine of *respondeat superior*.

### A.   Count IV, Trespass

Plaintiff does not appear to contest the Defendants' argument that his claim for trespass is barred by Indiana Code Section 34-13-3-3(8).   Therefore, Defendants' motion for summary judgment is **GRANTED** on Count IV of Plaintiff's Complaint.

### B.   Count V, Battery

Under Indiana law, a police officer may use only the force that is reasonable and necessary for effecting an arrest.   Ind. Code § 35-41-3-3(b).   "If a police officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 866 (S. D. Ind. 2006) (citing *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. Ct. App. 1995)).   The Indiana excessive force standard is basically the same as the federal standard outlined above.   *Id*. (citing *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000)). Accordingly, for the reasons outlined in Section III. C of this Entry, Defendants' motion for summary judgment on Count V of Plaintiff's Complaint for battery/excessive force is **GRANTED**.

###### C.      Count VI, False Imprisonment

Under Indiana law, a plaintiff alleging a claim of false imprisonment must demonstrate that he was arrested without probable cause.  *Conwell v. Beatty*, 667 N.E.2d 768, 775 (Ind. Ct. App. 1996).  As shown above, there remains a genuine issue of material fact as to whether the Officers had probable cause to arrest Plaintiff.  Therefore, Defendants' motion for summary judgment on Count VI of Plaintiff's Complaint is **DENIED**.

### V.      Conclusion

For the reasons explained above, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part** (Filing No. 24).  Defendants' motion is **GRANTED** on Counts III (Section 1983 excessive force), IV (trespass under Indiana law), and V (battery under Indiana law) and **DENIED** on Counts I (Section 1983 unlawful entry), II (Section 1983 false arrest), and VI (false imprisonment under Indiana law).

**SO ORDERED** this 28th day of September 2016.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.